**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 4, 2019**

# In the Court of Appeals of Georgia

A19A1483. YASH SOLUTIONS, LLC v. NEW YORK GLOBAL CONSULTANTS CORP.

DILLARD, Presiding Judge.

Yash Solutions, LLC appeals the trial court's partial grant of summary judgment to New York Global Consultants Corporation ("NYG") as to its breach-of-contract claim, as well as the denial of its breach-of-contract counterclaim—all related to non-compete and payment clauses. Yash also maintains that, at the subsequent jury trial, the jury erred in awarding attorney fees to NYG for bad faith and stubborn litigiousness, and the trial court erred in denying its motion for a new trial. For the reasons set forth *infra*, we affirm.[1]

---

[1] In the parties' initial briefs, their citations to the relevant trial transcripts did not correspond to the correct portions of the appellate record. And given the voluminous nature of this record (including 16 volumes and 2,036 total pages), we issued an order instructing the parties to submit amended briefs with corrected record

Viewing the summary-judgment evidence in the light most favorable to Yash

(*i.e.*, the nonmovant) and the evidence presented at trial in the light most favorable

to the jury's verdict,[2] the record shows that NYG was formed in 2007 to provide

and transcript citations. *See* Ga. Ct. App. R. 25 (a) (1) (requiring appellants to provide "a succinct and accurate statement of . . . the material facts relevant to the appeal . . . [and] a citation to the parts of the record or transcript essential to a consideration of the errors . . ."); Ga. Ct. App. R. (c) (2) (iii) ("Reference to the record should be indicated by specific volume or part of the record and by (R-Page Number of the Record). Reference to the transcript should be indicated by specific volume or part of the transcript and by (T-Page Number of the Transcript.")). NYG complied with this order, but Yash—the party seeking to establish errors below—failed to do so. Suffice it to say, it is not the function of this Court to "cull the record on behalf of a party in search of instances of error." *Guilford v. Marriott Int'l, Inc.*, 296 Ga. App. 503, 504 (675 SE2d 247) (2009) (punctuation omitted); *see Dixon v. Metro. Atlanta Rapid Transit Auth.*, 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000) ("[A]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and argument." (punctuation omitted)). Nevertheless, because the evidence necessary to resolve this appeal is relatively straightforward, "we exercise our discretion and will attempt (when possible) to consider [the] appeal on the merits based on our independent review of the record and with the aid of the citations provided by [NYG]." *Cawthon v. State*, 350 Ga. App. 741, 743 (830 SE2d 270) (2019); *see*, *e.g.*, *Patterson v. State*, 327 Ga. App. 695, 696 (1) (761 SE2d 101) (2014) (exercising discretion to address the merits of an appeal even though, *inter alia*, the appellant provided only sporadic record citations and noting that the appellee provided sufficient citations to the record in its brief). But if we have missed something in the record or misconstrued an argument because of the deficiencies in Yash's brief, the responsibility rests with Yash. *See, e.g., Brittain v. State*, 329 Ga. App. 689, 693 (2) (766 SE2d 106) (2014).

[2] *See Hartry v. Ron Johnson Jr. Enters., Inc.*, 347 Ga. App. 55, 56 n.4 (815 SE2d 611) (2018) ("To the extent that the . . . appeal implicates the jury verdict, we review the record to determine whether there is any evidence to support the verdict.

2

information-technology consulting, software development, and project-management services. Similarly, Yash is an IT consulting and business-solutions firm, "providing business consulting and staffing solutions to its [c]lients through the placement of consultants and professionals." Particularly relevant here, Yash and NYG both recruit and screen IT consultants to place with other companies. To that end, on January 31, 2013, NYG and Yash entered a Master Supplier Agreement ("MSA"), under which NYG agreed to provide its own IT consultants to Yash, and Yash agreed to facilitate placements for those consultants with its clients. Under Article V of the MSA, when Yash successfully makes such a placement, NYG is required to submit an invoice to Yash within 45 days, but Yash has no obligation to pay the invoice until it first receives payment from its client for the consultant. Yash made its profits by billing clients at a 25 percent markup above the amount it paid NYG.

---

To the extent that we review the summary judgment order, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. And because summary judgment is a matter of law, we review the issue de novo." (punctuation and citation omitted)); *Hamblin v. City of Albany*, 272 Ga. App. 246, 246 (612 SE2d 69) (2005) ("We review a trial court's grant of summary judgment de novo, construing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."); *SEC, Inc. v. Puckett*, 252 Ga. App. 422, 422 (2) (555 SE2d 198) (2001) ("[W]e view the evidence presented at trial in a light most favorable to the jury's verdict and determine whether there is any evidence to support that verdict.").

3

Additionally, the parties executed addendums governing NYG and Yash's arrangement for placing consultants with specific Yash clients, including one named EMC.[3] The EMC addendum's provisions regarding Yash's payment of NYG's invoices are substantially similar to those set forth in the MSA. But the EMC addendum specifically requires Yash to pay the amount due on an NYG invoice within five days of receiving payment from EMC—*i.e.*, the "pay-when-paid" provision. The MSA also includes a non-compete clause (detailed *infra*), which essentially prohibits NYG from rendering the same or similar services that Yash provides under the MSA to its clients that are the subject of an addendum to the MSA. This prohibition applies during the term of the MSA and for one year following its termination.

During the term of the MSA, Yash placed two NYG consultants—Vikram Rathi and Benedict Pinto—with EMC for various projects between March 2013 and February 2015. Initially, Yash paid NYG within five days of receiving payments from EMC in compliance with the MSA. But in October 2014, things changed. One of Rathi's placements concluded, and Yash was informed that it could find him a new

---

[3] The EMC addendum indicates that it was "dated" November 1, 2011, but was "made and entered" on January 31, 2013.

placement with EMC. Rathi declined this EMC placement, stating that "he did not want or he would find some reason not to accept that particular offer." And shortly thereafter, Sumit Bagga—Yash's operations manager—contacted Rathi's accountant and discovered that he had already been placed with EMC for a new project. Then, on November 14, 2014, Rathi sent Bagga a message using an EMC email account, notifying Bagga that he was "working on a different project" and Bagga should contact NYG with any questions.

On December 30, 2014, after learning of Rathi's new EMC placement, Yash's attorney sent a letter to NYG, alleging that NYG had breached the MSA's non-compete clause by placing Rathi directly with EMC, rather than through Yash. The letter further instructed NYG to terminate Rathi's "unauthorized placement" with EMC and cease any and all discussions with EMC about providing it with additional resources.

At first, Bagga thought Rathi's placement was the only one that violated the MSA, and as a result, Yash continued placing other NYG consultants in compliance with the terms of the agreement. But when Yash did not receive a response to its December 2014 letter, it refused to pay an invoice from NYG for Yash's prior placement of Rathi with EMC for a project that occurred in August 2014. Yash

declined to pay this invoice, even though it had already received payment from EMC for that placement.

Then, in January 2015, Pinto—another NYG consultant who had been placed on EMC projects by Yash—was nearing the end of his contract for one of those placements, and he sent an email to Mukesh Molugu—the president of NYG—and Yash, giving them two weeks' notice that he would be leaving the project. According to Molugu, Pinto told NYG that he did not want to work for Yash anymore due to phone calls that he was receiving from Bagga. But according to Bagga, Pinto informed Yash that NYG was pressuring him to leave the project and was not paying him properly. Nevertheless, Pinto submitted the necessary paperwork for Yash to place him with another company. And it was only sometime later that Yash discovered it could not place Pinto with that company because of the particular skills required. Then, after that "situation went south[,]" Pinto told Yash that direct placements through NYG were available to him. At this point, Bagga decided to investigate NYG's placements of its consultants because he now knew that "there was much more than just one [direct] placement going on." So, on February 16, 2015, Yash's attorney sent a second letter to NYG, addressing NYG's direct placement of Pinto with EMC and demanding "strict compliance" with the MSA. Specifically,

6

Yash contended that, under the non-compete clause, NYG was unauthorized to place Pinto directly with EMC, and in any event, NYG must notify Yash if that situation occurred.

Although Yash notified NYG that Pinto's recent placement violated the MSA, it did not inform NYG that it would no longer pay its invoices for any other pending placements. Nevertheless, Yash ceased paying NYG's invoices for prior placements of Rathi and Pinto on EMC projects, even though EMC paid Yash for those placements. According to Bagga, Yash did not pay those invoices because NYG circumvented Yash in placing Rathi and Pinto directly with EMC. And unaware of Yash's apparent belief that it was now exempt from complying with the MSA's pay-when-paid provision, NYG representatives made phone calls and sent emails to Yash, inquiring as to why its invoices were not being paid. Yash ignored those entreaties and went radio silent.

On March 10, 2015, after Yash refused to discuss its nonpayment of certain invoices, NYG filed a complaint, asserting two breach-of-contract claims based on Yash's failure to comply with the MSA's pay-when-paid provision and requesting expenses of litigation, including attorney fees. Yash filed an answer, asserting several affirmative defenses, as well as a breach-of-contract counterclaim based on NYG's

alleged breach of the MSA's non-compete clause.[4] Following discovery, NYG filed a motion for summary judgment as to all of its claims and Yash's counterclaim. Yash responded, filing a cross-motion for partial summary judgment as to its breach-of-contract counterclaim.

Ultimately, on March 7, 2018, the trial court entered an order on the parties' cross-motions for summary judgment. First, the court granted summary judgment to NYG on its breach-of-contract claims, finding that nothing in the MSA, including the non-compete provision, excused Yash from its obligation to pay NYG's invoices for placements that had already occurred and for which Yash had been paid. But the court denied NYG's claim for expenses of litigation and attorney fees under OCGA § 13-6-11, finding that there were genuine issues of material fact as to whether Yash acted in bad faith. Next, the court denied NYG's claim for summary judgment as to Yash's counterclaim, in which it alleged that NYG breached the non-compete restrictive covenant, finding that the claim was sufficiently pleaded to survive summary judgment. But the court also found that there were jury issues as to whether the MSA's non-compete clause was enforceable. Additionally, the court determined that,

---

[4] Yash filed other counterclaims, including fraudulent inducement and intentional interference with a contract, but those counterclaims are not at issue in this appeal.

8

even if it was enforceable, a jury must also decide whether Yash's actions amounted to a waiver of the non-compete provision.

Thereafter, the parties proceeded to a jury trial as to the claims that survived summary judgment, and ultimately, the jury entered a verdict in favor of NYG. Specifically, the jury found that, as to EMC, Yash waived NYG's compliance with the MSA's non-compete provision and that NYG was entitled to $83,146.20 in attorney fees because Yash acted in bad faith, was stubbornly litigious, or caused unnecessary trouble and expense. Yash now appeals both the summary-judgment order and the jury verdict.

1. *The Jury Trial.*[5] Yash challenges the jury's determination that it waived enforcement of the MSA's non-compete provision, as well as the jury's award of attorney fees to NYG.[6] We will address each of these claims in turn.

---

[5] Although Yash presents its arguments in a different order, we address its claims of error related to the jury trial first because "[when] a motion for summary judgment is overruled on an issue and the case proceeds to trial and the evidence at the trial authorizes the verdict (judgment) on that issue, any error in overruling the motion for summary judgment is harmless." *One Bluff Drive, LLC v. K.A.P., Inc.*, 330 Ga. App. 45, 50-51 (2) (766 SE2d 508) (2014) (punctuation omitted); *accord First Fin. Ins. Co. v. Mathis*, 214 Ga. App. 537, 538 (448 SE2d 87) (1994).

[6] In listing its claims of error, Yash purports to challenge the trial court's denial of its motion for a new trial, but in the argument section of the brief, it argues only that the jury's verdict regarding waiver was unsupported by the evidence. Regardless,

9

When a jury returns a verdict, the verdict must be affirmed on appeal if "there is any evidence to support it, and the evidence is to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the verdict."[7] And we review a denial of a motion for a new trial "according to this same standard."[8] Therefore, a jury verdict, "after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[9] With this standard of review in mind, we turn to Yash's specific claims of error.

(a) Yash first contends that the jury's finding it waived enforcement of the non-compete provision in the MSA was unsupported by the evidence. We disagree.

Throughout this litigation, Yash essentially argued that NYG violated the non-compete clause in the MSA by placing its consultants directly with EMC instead of

---

both arguments essentially challenge the sufficiency of the evidence to authorize the jury's verdict as to waiver, and are, as explained further, subject to the same standard of review.

[7] *Green v. Key Custom Homes, Inc.*, 302 Ga. App. 800, 802 (1) (692 SE2d 56) (2010) (punctuation omitted).

[8] *Id.* (punctuation omitted).

[9] *Id.* at 802-03 (1) (punctuation omitted).

10

doing so exclusively through Yash, as required under the terms of the MSA. In relevant part, Article X (A) of the MSA provides:

> Noncompetition. [NYG] agrees that during the term of this Agreement, and for a period of 1-year following termination of this Agreement, regardless of the reason, [NYG] will neither directly nor indirectly (i) *provide services that are the same or similar to those services provided under this Agreement or any Statement of Work for any client or clients that [NYG] has specifically executed any Addendum to provide services to said client or clients*; (ii) communicate with those clients for the purpose of providing services, unless authorized to do so in writing by YASH; and (iii) induce, solicit or accept work from those specific clients. If [NYG] discovers that it has either unintentionally violated any of those restrictions or that any client or clients that have contacted [NYG] directly for the purposes of providing same or similar services [NYG] provided under this agreement, [NYG] will immediately notify YASH of this contact and refrain from any further contact with YASH'S client and decline to provide any services to the client.[10]

According to Yash, because NYG executed an addendum specifically governing Yash's placement of NYG consultants with EMC, NYG breached this non-compete provision by placing Pinto and Rathi directly with EMC, instead of through Yash. Yash further contends that this alleged breach exempted it from complying with the

---

[10] (Emphasis supplied).

pay-when-paid provision of the MSA—*i.e.* paying NYG's invoices within five days of receiving payment from EMC—as to those consultants.

At the summary-judgment stage, as to Yash's breach-of-contract counterclaim, the trial court concluded that there were genuine issues of material fact regarding whether the non-compete provision was enforceable, and if so, whether Yash waived enforcement of the provision by "continuing to operate under the MSA" after learning of the direct placements. As a result, those issues proceeded to trial, and ultimately, the jury found that "by a preponderance of the evidence[,] . . . [Yash] waived [NYG's] compliance with the [non-compete clause] in the [MSA] with [NYG]."

As we have previously explained, waiver of a contract provision may be "express, or may be inferred from actions, conduct, or a course of dealing."[11] Put another way, waiver of a contract right may "result from a party's conduct showing

---

[11] *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 562 (5) (610 SE2d 92) (2005) (punctuation omitted); *accord Smith v. Gordon*, 266 Ga. App. 814, 815 (1) (a) (598 SE2d 92) (2004); *see Kennestone Hosp. v. Hopson*, 273 Ga. 145, 148 (538 SE2d 742) (2000) ("Waiver is the voluntary relinquishment of a known right and may be established by express statements or implied by conduct. An implied waiver is one shown by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." (punctuation and footnotes omitted)); *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 321 Ga. App. 451, 453-54 (1) (739 SE2d 493) (2013) ("[A] party to a contract may waive a contractual right, and . . . any such waiver may be accomplished expressly or implicitly through the party's conduct.").

12

his election between two inconsistent rights."[12] Specifically, acting on the theory that the contract is still in force, "as by continuing performance, demanding or urging further performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute waiver of a breach."[13] Nevertheless, all of the attendant facts, taken together, must "amount to an intentional

---

[12] *Bollea*, 271 Ga. App. at 562 (5) (punctuation omitted); *accord Smith*, 266 Ga. App. at 815 (1) (a); *see Chapple v. Hight*, 161 Ga. 629, 631 (1) (131 SE 505) (1926) ("The law compels an election between inconsistent remedies. Waiver by election results where a choice is exercised between inconsistent remedies; and in such a case any decisive act of affirmance or disaffirmance, done with knowledge of the facts, determines the rights of the parties once and for all." (citations omitted)). *Cf. SunTrust Bank v. Lilliston*, 302 Ga. 840, 840 (809 SE2d 819) (2018) ("Despite the strong presumption against the waiver of the right to arbitrate, such a right may be waived by a party who acts inconsistently with that right and, in so doing, prejudices the other party to the contract.").

[13] *Bollea*, 271 Ga. App. at 562 (5) (punctuation omitted); *accord Wallace v. Wallace*, 345 Ga. App. 764, 770 (1) (c) (813 SE2d 428) (2018); *Greater Ga. Life Ins. Co. v. Eason*, 292 Ga. App. 682, 687 (2) (665 SE2d 725) (2008); *Smith*, 266 Ga. App. at 815 (1) (a).

relinquishment of a known right, in order that a waiver may exist."[14] But significantly, when the evidence is in conflict, "the issue of waiver must be decided by the jury."[15]

Here, Yash presented evidence that—after it first discovered the direct placements in November 2014—its attorney sent two letters to NYG (one in December 2014 and the other in February 2015), asserting that NYG breached the MSA's non-compete provision and demanding strict performance with the terms of the agreement. And while the letters demonstrated its intent to enforce the non-compete provision, Yash never pursued the contractual remedies available for it to do so. Indeed, as discussed in Division 2 (b) *infra*, the MSA expressly provides that,

---

[14] *Bollea*, 271 Ga. App. at 562 (5) (punctuation omitted); *accord Wallace*, 345 Ga. App. at 770 (1) (c); *Smith*, 266 Ga. App. at 815 (1) (a); *see Unified Gov't of Athens-Clarke Cty. v. Stiles Apartments, Inc.*, 295 Ga. 829, 834 (4) (764 SE2d 403) (2014) ("Where the only evidence of an intention to waive is what a party does or forbears to do, there is no waiver unless his acts or omissions to act are so manifestly consistent with an intent to relinquish a then-known particular right or benefit that no other reasonable explanation of his conduct is possible." (punctuation omitted)); *Floyd v. Floyd*, 291 Ga. 605, 606 (1) n.3 (732 SE2d 258) (2012) (same); *MNM 5, Inc. v. Anderson/6438 Ne. Partners, Ltd.*, 215 Ga. App. 407, 410 (2) (451 SE2d 788) (1994) (same).

[15] *Brewer v. Royal Ins. Co. of Am.*, 283 Ga. App. 312, 316 (641 SE2d 291) (2007); *accord Young v. Oak Leaf Builders, Inc.*, 277 Ga. App. 274, 277 (1) (626 SE2d 240) (2006); *see Delacruz v. State*, 280 Ga. 392, 397 (3) (627 SE2d 579) (2006) ("Resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court." (punctuation omitted)).

if NYG breached the non-compete provision, Yash was entitled to pursue any remedy in law or in equity, including injunctive relief. But Yash never sought injunctive relief or sued NYG for damages.

Instead, Yash continued performing under the MSA and encouraging NYG to do the same for quite some time after learning of its alleged breach. Indeed, even after Yash's attorney sent the aforementioned letters to NYG, Yash continued sending emails to NYG, asking it to submit candidates to Yash for placement. And at trial, Yash's president admitted that, at least as of September 2016, two years *after* learning of NYG's direct placements of Rathi and Pinto with EMC, "[Yash] continue[d] to promote placements [for] which [NYG] consultants are eligible to submit as a resource." Significantly, when explaining why it continued to seek NYG consultants for new placements, Yash's president testified that the MSA *had never been terminated.* Additionally, NYG's president (Molugu) testified that Yash was *still* seeking to place its consultants at the time of trial in April 2018, several years after discovering NYG's alleged breach of the non-compete provision in 2014. Simply put,

the foregoing actions by Yash, including its express admission at trial that it believed the MSA was still in force, are evidence that supports the jury's verdict as to waiver.[16]

The jury was presented with conflicting evidence, then, regarding waiver. On the one hand, the two letters Yash sent to NYG shortly after it discovered the direct placements evinced its intent to enforce the non-compete provision. But there was also significant evidence of Yash's conduct spanning *years* after it sent those letters from which the jury could infer that it intended to continue operating under the MSA and accept its benefits.[17] And because there was conflicting evidence regarding

---

[16] *See Wallace*, 345 Ga. App. at 771 (1) (c) ("Based on the evidence in the record, we conclude that there is no other reasonable explanation for the parties' inaction but to infer that the parties' mutual failure to adhere to the 60-day repurchase and sale term in the Agreement was a waiver of the breach and *a decision to treat the remaining contract as in force*." (emphasis supplied)); *Young*, 277 Ga. App. at 277 (1) (explaining that acting on a theory that the contract is *still in force*, among other things, may constitute waiver of the breach); *Bollea*, 271 Ga. App. at 562 (5) (same).

[17] *See Young*, 277 Ga. App. at 277 (1) (explaining that "continuing performance, demanding or urging further performance, or permitting the other party to perform and accepting or *retaining benefits under the contract*, may constitute waiver of the breach" (punctuation omitted) (emphasis supplied)); *Bollea*, 271 Ga. App. at 562 (5) (same); *Eckerd Corp. v. Alterman Props., Ltd.*, 264 Ga. App. 72, 75 (1) (589 SE2d 660) (2003) (same).

16

whether Yash intended to waive enforcement of the non-compete provision,[18] the question of waiver was for the jury, and not this Court, to decide.[19]

---

[18] *See Wallace*, 345 Ga. App. at 771 (1) (c) (concluding that a buy-back provision in an employment contract was waived by the parties when "there [was] no other reasonable explanation for the parties' inaction but to infer that the parties' mutual failure to adhere to the [provision] in the Agreement was a waiver of the breach and a decision to treat the remaining contract as in force"); *Vratsinas Const. Co.*, 321 Ga. App. at 455-56 (1) (holding that the trial court erred in submitting the issue of waiver to the jury when, *inter alia*, the party who, as a matter of law, waived a pay-if-paid provision "continued working and submitted *seven* additional payment applications in accordance with the parties' practice" *after* the purported breach); *Forsyth Cty. v. Waterscape Servs., LLP,* 303 Ga. App. 623, 631-32 (2) (a) (694 SE2d 102) (2010) (holding that appellee waived its right to terminate a construction contract based on appellant's failure to comply with certain contractual obligations that it was required to perform *prior* to construction because, despite knowledge of the alleged breach, appellee began and completed construction of the wastewater-treatment plant at issue); *N.Y. Underwriters Ins. Co. v. Noles*, 101 Ga. App. 922, 926 (115 SE2d 474) (1960) (holding that an insurance company waived a sworn-proof-of-loss contractual requirement when the company continuously negotiated a settlement through the time period within which the insured must file a sworn proof of loss and misled the insured into believing that no other requirement was necessary to a settlement).

[19] *See Hill v. State*, 284 Ga. 521, 522 (1) (668 SE2d 673) (2008) ("Resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court." (punctuation omitted)); *HA & W Fin. Advisors, LLC v. Johnson*, 336 Ga. App. 647, 652 (1) (782 SE2d 855) (2016) ("When the evidence is in conflict, the issue of waiver must be decided by the jury." (punctuation omitted)); *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 217 (4) (a) (707 SE2d 508) (2011) (same); *Eckerd Corp.*, 264 Ga. App. at 76 (1) (same); *supra* note 15 & accompanying text.

Nevertheless, Yash argues that the jury's verdict must be reversed because the MSA contains a "no-waiver" provision. Specifically, Article XIII (K) of the MSA provides that "[t]he failure of a party to enforce the provisions of this Agreement will not be a waiver of a provision or right of such party thereafter to enforce each and every provision of this Agreement." But Yash concedes that, under Georgia law, a no-waiver or anti-waiver provision in a contract may itself be waived.[20] And here, the trial court instructed the jury regarding the no-waiver provision,[21] and the jury obviously concluded that Yash's conduct of continuing to operate under the MSA's terms and encouraging NYG to do the same *for years* after discovering the alleged breach was significant enough to constitute a waiver of that provision as well.[22]

---

[20] *See Smith v. General Fin. Corp. of Ga.*, 243 Ga. 500, 501 (255 SE2d 14) (1979) ("[A] provision in a contract against waiver of contractual rights may itself be found by the jury to have been waived."); *J. E. M. Enterprises, Inc. v. Taco Pronto, Inc.*, 145 Ga. App. 573, 575 (3) (244 SE2d 253) (1978) (same); *Few v. Automobile Fin., Inc.*, 101 Ga. App. 783, 784 (115 SE2d 196) (1960) (same).

[21] The trial court instructed the jury as follows: "A contractual anti-waiver clause allows a party to require strict compliance with the contract provision going forward, despite its failure to do so previously. A provision in a contract against waiver of contractual rights may be waived by the subsequent conduct of the parties."

[22] *See Smith*, 243 Ga. at 500 ("[E]vidence of the buyer's repeated, late, irregular payments, which are accepted by the seller, does create . . . a jury question . . . as to whether the anti-waiver provision in the loan contract was itself waived."); *Baxter v. Ga. Fed. Sav. & Loan Ass'n*, 152 Ga. App. 753, 754 (1) (264 SE2d 242) (1979)

18

Simply put, because there is some evidence to support the jury's verdict as to waiver, it must be affirmed.[23]

(b) Yash next argues that there was a "dearth of evidence" to support the jury's award of attorney fees under OCGA § 13-6-11. This claim likewise lacks merit.

In Georgia, expenses of litigation and attorney fees may be awarded, under OCGA § 13-6-11, if "the fact-finder determines the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."[24] And questions concerning bad faith, stubborn litigiousness, and

---

(citing *Smith* and holding that a bank's acceptance of late and irregular loan payments created a jury question "as to whether the anti-waiver provision in the loan contract was itself waived"); *Crawford v. First Nat. Bank of Rome*, 137 Ga. App. 294, 295 (223 SE2d 488) (1976) ("[E]ven a contractual provision against waiver may be waived by conduct. Thus, the question of whether the conduct of the parties causes a waiver of contract provisions, and a quasi new agreement effected, ordinarily, *is a question of fact for a jury*." (citation omitted) (emphasis supplied)); *supra* note 20.

[23] *See Scott v. Scott*, 243 Ga. 472, 472 (254 SE2d 852) (1979) ("One of the most basic rules of appellate review is that, if there is any evidence to support the jury's verdict and court's judgment, the judgment will not be disturbed on appeal."); *supra* note 2.

[24] *Atlanta Emergency Servs. v. Clark*, 328 Ga. App. 9, 13 (2) (761 SE2d 437) (2014) (punctuation omitted); *accord Forsyth Cty. v. Martin*, 279 Ga. 215, 219 (2) (b) (610 SE2d 512) (2005); *see* OCGA § 13-6-11 ("The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made [a] prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary

unnecessary trouble and expense under OCGA § 13-6-11 are "generally questions for the jury to decide."[25] Indeed, an award of attorney fees under OCGA § 13-6-11 is to be affirmed if "there is any evidence to support it."[26]

In support of its challenge to the attorney-fee award, Yash contends generally that there was no evidence it acted in bad faith, was stubbornly litigious, or caused NYG unnecessary trouble and expenses. But then, Yash provides a string of purported factual allegations regarding its "good faith" efforts to avoid litigation without a *single* citation to the record to support them. And given its failure to comply with our rules, we may decline to consider this claim of error.[27] Indeed, we have

trouble and expense, the jury may allow them.").

[25] *Atlanta Emergency Servs.,* 328 Ga. App. at 13 (2) (punctuation omitted); *accord Martin*, 279 Ga. at 219 (2) (b).

[26] *Atlanta Emergency Servs.*, 328 Ga. App. at 13 (2) (punctuation omitted); *accord City of Gainesville v. Waters*, 258 Ga. App. 555, 559 (4) (574 SE2d 638) (2002); *see L. S. Land Co. v. Burns*, 275 Ga. 454, 457 (3) (569 SE2d 527) (2002) ("The standard of review of an award of attorney[ ] fees under OCGA § 13-6-11 is whether there is any evidence to support the award. The appellate courts cannot reverse such an award merely because the evidence would have supported a verdict for the defendant." (punctuation and citation omitted)).

[27] *See* Ga. Ct. App. R. 25 (2) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court *will not search for and may not consider that enumeration.*" (emphasis supplied)); *supra* note 1.

20

*repeatedly* cautioned litigants that "[a]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and argument."[28] To the contrary, the burden is upon the party alleging error to "show it affirmatively in the record."[29] Suffice it to say, Yash has failed to satisfy this burden. And beyond presenting its unsupported version of the facts, Yash makes no discernable *legal argument* challenging the propriety of the attorney-fee award for this Court to address.[30]

Furthermore, at trial, NYG argued to the jury that the specific bad-faith act justifying the attorney-fee award was Yash's failure to pay its invoices when the

---

[28] *Bennett v. Quick*, 305 Ga. App. 415, 416 (699 SE2d 539) (2010) (punctuation omitted); *accord Vick v. Tower Place, L.P.*, 268 Ga. App. 108, 109 (2) (601 SE2d 348) (2004); *Sulejman v. Marinello*, 217 Ga. App. 319, 320 (1) (457 SE2d 251) (1995); *see Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735 (688 SE2d 414) (2009) ("It is not the function of this Court to cull the record on behalf of a party in search of instances of error." (punctuation omitted)).

[29] *Bennett*, 305 Ga. App. at 416 (punctuation omitted); *Fleming*, 301 Ga. App. at 735; *Guilford*, 296 Ga. App. at 504.

[30] *See Farmer v. Dep't of Corr.*, 346 Ga. App. 387, 394 (2) (816 SE2d 376) (2018) ("[M]ere conclusory statements are not the type of meaningful argument contemplated by our rules." (punctuation omitted)); *Dixon*, 242 Ga. App. at 266 (4) ("Rhetoric is not a substitute for cogent legal analysis, which is, at a minimum, a discussion of the appropriate law as applied to the relevant facts." (punctuation omitted)).

21

MSA indisputably required it to do so. And while Yash contends that it made good-faith attempts to resolve its dispute with NYG without the need for litigation, it concedes that it did not comply with the pay-when-paid provision of the MSA, which was the basis for NYG initiating this litigation. Thus, in challenging the attorney-fee award, Yash fails to address the only act of bad faith presented to the jury. Regardless, this litigation was initiated based on Yash's failure to make payments to NYG that it was obligated to pay under the MSA, and as explained in Division 2 (b), Yash had no justification, contractual or otherwise, for failing to do so. Under these circumstances, we cannot say that the jury's attorney-fee award was not supported by at least some evidence.[31]

---

[31] *See Martin*, 279 Ga. at 219 (2) (b) (holding that there was evidence to support a jury award of attorney fees under OCGA § 13-6-11 when the appellee presented evidence that the appellant had been stubbornly litigious in its efforts to re-litigate an issue that had been resolved in a prior proceeding); *Spring Lake Prop. Owners Ass'n, Inc. v. Peacock*, 260 Ga. 80, 81 (390 SE2d 31) (1990) (holding that there was some evidence to support a jury award of attorney fees under OCGA § 13-6-11 when the appellant built a gate that obstructed the appellees' easement and "[t]he failure of appellant to admit its mistake and remove the obstruction across appellees' easement showed stubborn litigiousness"); *Ins. Indus. Consultants, LLC v. Alford*, 294 Ga. App. 747, 751 (6) (669 SE2d 724) (2008) (holding that there was evidence from which the jury could conclude the defendant was stubbornly litigious and acted in bad faith by "refusing to pay [the plaintiff] monies to which he was legally entitled to under the contract"); *Wheat Enters., Inc. v. Redi-Floors, Inc.*, 231 Ga. App. 853, 857 (1) (c) (501 SE2d 30) (1998) ("[D]efendants can be held liable for attorney fees if they committed the breach [of contract] in bad faith." (punctuation omitted)); *see*

2. *Summary Judgment.* In two claims of error, Yash argues that the trial court erred by denying it summary judgment as to its breach-of-contract counterclaim against NYG, and granting summary judgment to NYG as to its direct breach-of-contract claim against Yash. We disagree on both counts.

On appeal from the grant or denial of a motion for summary judgment, we review the evidence *de novo*, and "all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant."[32] Summary judgment is appropriate when "the moving party can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."[33] And a defendant meets this burden when "the court is shown that the documents, affidavits, depositions[,] and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the

---

*also City of Lilburn v. Astra Grp., Inc.*, 286 Ga. App. 568, 570 (649 SE2d 813) (2007) (explaining that questions of bad faith and stubborn litigiousness are generally questions for the jury to decide and an award of attorney fees under OCGA § 13-6-11 will be affirmed if there is any evidence to support it).

[32] *McCaskill v. Carillo*, 263 Ga. App. 890, 890 (589 SE2d 582) (2003).

[33] *Kelly v. Harris*, 329 Ga. App. 752, 753 (766 SE2d 146) (2014) (punctuation omitted).

23

plaintiff's case."[34] Lastly, if the moving party satisfies this burden, "the nonmoving party cannot rest on its pleadings, but must point to specific evidence giving rise to a triable issue."[35] With these guiding principles in mind, we turn to Yash's specific claims of error.

(a) *Yash's Breach-of-Contract Counterclaim*. Yash first argues that the trial court erred in denying its motion for partial summary judgment as to its breach-of-contract counterclaim because NYG violated the express terms of the MSA's non-compete provision by placing its consultants directly with EMC.

Specifically, Yash contends that NYG breached Article X of the MSA by placing Rathi and Pinto—its own consultants—directly with EMC instead of making those placements through Yash in compliance with the terms of the agreement. In denying Yash's motion for summary judgment as to that claim, the trial court found that there were jury questions as to the enforceability of this provision under OCGA § 13-8-50, and that even if this provision was enforceable, the jury would still need to determine whether Yash waived its right to enforce that provision through its conduct. As explained in Division 1 (a) *supra*, at the close of trial, the jury expressly

---

[34] *Id.* (punctuation omitted).

[35] *Id.* (punctuation omitted).

24

found that Yash waived enforcement of the non-compete provision, and there was sufficient evidence to support that finding. And the Supreme Court of Georgia has held that after verdict and judgment, it is "too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case."[36] Put another way, when a motion for summary judgment is "overruled on an issue and the case proceeds to trial and the evidence at the trial authorizes the verdict (judgment) on that issue, any error in overruling the motion for summary judgment is harmless."[37] Thus, regardless of whether NYG breached the MSA's non-compete clause, the jury found that Yash waived enforcement of that provision, rendering any error by the trial court at the summary-judgment stage harmless.[38]

---

[36] *Moore v. Moore*, 281 Ga. 81, 85 (6) (635 SE2d 107) (2006) (punctuation omitted); *accord One Bluff Drive, LLC*, 330 Ga. App. at 50 (2); *Certain Underwriters at Lloyd's of London v. Rucker Const., Inc.*, 285 Ga. App. 844, 845 (1) (648 SE2d 170) (2007).

[37] *Lynas v. Williams*, 216 Ga. App. 434, 435 (1) (454 SE2d 570) (1995) (punctuation omitted); *accord Dunlap v. Dunlap*, 234 Ga. 304, 306 (3) (215 SE2d 674) (1975); *Certain Underwriters at Lloyd's of London*, 285 Ga. App. at 845 (1).

[38] *See, e.g.*, *AgSouth Farm Credit, ACA v. Gowen Timber Co., Inc*, 336 Ga. App. 581, 586 (1) (784 SE2d 913) (2016) (holding that the resolution of the appellant's motion for summary judgment was moot when the issue raised in the motion was resolved at trial); *Oakhurst Presbyterian Church, Inc. v. Hendrix*, 298 Ga.

(b) Finally, Yash claims that the trial court erred in granting summary judgment to NYG as to its breach-of-contract claim, which was based on Yash's failure to pay certain NYG invoices in violation of the MSA's pay-when-paid provision.

The construction of a contract is, of course, a question of law for the court,[39] and involves three steps.[40] First, we must decide whether "the language of the contract is clear and unambiguous."[41] If it is, the contract must be "enforced according to its plain terms, and the contract alone is looked to for meaning."[42] Next, if the language of the contract is "ambiguous in some respect," the rules of contract construction "must be applied by the court to resolve the ambiguity."[43] Lastly, if ambiguity remains after applying the rules of construction, "the issue of what the ambiguous language

---

App. 226, 226 (1) (679 SE2d 742) (1) (2009) (holding that the trial court's denial of summary judgment presented nothing for this Court's review when a jury awarded a judgment against the movant as to the claim at issue).

[39] *See Bd. of Comm'rs of Crisp Cty. v. City Comm'rs of City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

means and what the parties intended must be resolved by a jury."[44] Indeed, the cardinal rule of contract construction is to "ascertain the intention of the parties," as reflected by the language of the agreement.[45]

As to NYG's breach-of-contract claim, Yash asserts that its "cessation of performance" of the pay-when-paid provision was predicated on NYG's breach of the MSA's non-compete provision. But setting aside the waiver of its ability to enforce the non-compete clause, Yash fails to identify any language *in the text* of the MSA excusing it from complying with the EMC addendum's pay-when-paid provision under *any* circumstances other than if Yash is not paid by its client,[46] much less language specifically conditioning payment on NYG's compliance with the unrelated non-compete clause. This is because the MSA contains no such language. Indeed, the MSA's non-compete clause, detailed in Division 1 (a) *supra*, lists all of the prohibited

---

[44] *Id.* (punctuation omitted).

[45] *Id.* (punctuation omitted).

[46] Unlike the non-compete provision of the MSA, under the provision in Article VIII titled "Performance Guarantee," Yash *is* excused from paying NYG if the client with whom the consultant is placed fails to pay Yash. But there is no similar exemption for a violation of the non-compete provision.

competitive conduct but makes no mention of Yash's payment obligations under the contract.

Yash also fails to acknowledge that Article XI of the MSA—which is titled "Remedies" and immediately follows the non-compete provision—provides that any violation of certain MSA provisions, including the non-compete clause, will result in "irreparable and continuing damage to YASH and Its Client," and as a result, the remedies available at law for any breach or threatened breach of the MSA would be inadequate. Article XI further provides that, in addition to any other remedies available at law or in equity, Yash "shall be entitled to temporary, preliminary[,] and permanent injunctive relief, without the necessity of posting bond, and actual attorneys' fees and costs in enforcing this Agreement." Thus, the specific provision regarding the remedies available for a breach of the non-compete clause also makes no reference to the payment provisions of the MSA, much less any exemptions from paying NYG's invoices.

Nevertheless, Yash maintains that NYG's competitive misconduct justified nonpayment of its invoices, and the jury should have been permitted to hear evidence of such misconduct at trial. But we have held that unless an ambiguity exists, the court "may not look outside the terms of the contract to consider surrounding

circumstances or parol evidence."[47] Indeed, when the language of the contract is clear and unambiguous, it will be "enforced according to its plain terms, and the contract *alone* is looked to for meaning."[48] And here, because Yash's payment obligations under the MSA were not ambiguous, any evidence of NYG's misconduct was irrelevant in considering whether Yash breached the pay-when-paid provision. In sum, while Yash makes arguments based on "fairness," it makes no attempt to identify any *actual language* in the contract to support its argument. Suffice it to say, this is fatal to its claim of error.[49]

---

[47] *4 G Props., LLC v. GALS Real Estate, Inc*., 289 Ga. App. 315, 316 (656 SE2d 922) (2008); *see Irvin v. Laxmi, Inc*., 266 Ga. 204, 205 (1) (467 SE2d 510) (1996) ("Parol evidence may not be considered unless the written instrument is ambiguous."); *de Castro v. Durrell*, 295 Ga. App. 194, 200 (2) (a) (671 SE2d 244) (2008) ("Neither parol evidence nor surrounding circumstances may be considered unless the [contract] is ambiguous.").

[48] *Bd. of Comm'rs of Crisp Cty.*, 315 Ga. App. at 699 (emphasis supplied).

[49] *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 794 (2) (546 SE2d 781) (2001) ("Whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning."); *Johnson*, 336 Ga. App. at 655 (3) (same); *Garrett v. S. Health Corp. of Ellijay*, 320 Ga. App. 176, 182 (1) (739 SE2d 661) (2013) ("If the terms of a contract are plain and unambiguous, the contractual terms *alone* determine the parties' intent." (emphasis supplied)); *Blue Cross & Blue Shield of Ga., Inc. v. Shirley*, 305 Ga. App. 434, 437 (1) (699 SE2d 616) (2010) (explaining that, in construing a contract provision, "the trial court must decide whether the language is clear and

For all these reasons, we affirm the trial court's grant of summary judgment to NYG and the jury's verdict in its favor.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

unambiguous[,] [and] [i]f it is, the court simply enforces the contract according to its clear terms; *the contract alone* is looked to for its meaning" (emphasis supplied)).